George Andrews, J.,
delivered the opinion of the Court.
This cause has been once before this Court upon appeal from an interlocutory decree of the Chancery Court of Williamson county, and is reported in 3 Head, 728, under the title of Stephenson vs. Harrison.
The object of the litigation is to determine the rights of the parties interested in the estate of Samuel Winstead, ■who died in 1851, leaving a last will and testament, of which the defendants, Harrison and Puryear, were appointed and duly qualified the executors.
The will of Samuel Winstead was executed in 1845. By the terms of clause. 1st, the burial expenses and debts of the testator were directed to be paid as soon after his decease as possible. By clause 2nd, the testator gives to his widow, Susannah Winstead, “all my property, both real and personal, during her life, including any money on hand, or notes or accounts due me, to dispose of as she may need for the use of the family, excepting my tract of land near Spring Hill, and my house and lot in.Spring Hill, and my lots in Franklin.”
By the 3rd clause of the will, the above mentioned real estate was directed to be sold, and the proceeds to *195 be deposited in the Planters’ Bank, “and also the amount of money and debts that is due me, reserving to my wife any of the last mentioned money as she may need for the use and benefit of my negroes, during her life; and at the death of my wife, Susannah Winstead, it is my will and desire that all my slaves be set free; and it is also my wish and desire that the County Court appoint some good, disinterested man, to make the necessary arrangements for taking my negroes to Liberia; and the man appointed to be paid what the Court may think is right, out of the money that is deposited' in bank, from the land and lots before mentioned; and the balance of the money from the sale of the land and lots to be used in paying the expense of moving my slaves to Liberia; and the remaining balance to be equally divided between them after all expenses are paid.”
The same clause then provides that, in case any of the negroes be unwilling to go to Liberia, they may choose masters' in Williamson county, and that the money which it would cost to carry them to Liberia be paid to them here; but if it should not be legal for that to be done, then such slaves to be sold to the person chosen and the proceeds of sale to be given, one-fourth. to the slave so sold and the other three-fourths to be divided among the other negroes.
In clause 4th, the testator gives to his widow “my tract of land on which I now live, during her life, and at her death to dispose of as she may think proper ; also one thousand dollars in money, and twenty shares of stock in the Columbia Road, and all my household and *196 kitchen furniture, together with all the rents and profits of my land and negroes during her life, and at her death to dispose of as she may think fit.”
Clause 5th directs ■ certain lands to be sold after the decease of the widow, on one, two and three years’ credit, “and all my other property on one year’s credit.”
Clause 6th gives the proceeds of the property last above mentioned, to certain nephews and nieces.
Clause 7th directs that if the County Court will not appoint a person to take the negroes to Liberia, the executors should appoint some one for that purpose; and that “the money so deposited in the bank from the sale of my land and lots, together with any remaining money of my estate that is not otherwise disposed of, after all expense is paid, to be divided equally with my negroes that go to Liberia.”
By a codicil executed shortly before the testator’s death, in 1851, he directs that “all ray money which shall be deposited in the bank by my executors” shall be applied to the same uses and purposes that the proceeds of the Spring Hill tract of land is appropriated to. He also directs that none of his negroes shall have the liberty to choose their masters and remain as slaves; but that all of them and their issue, shall be set free and remove to Liberia.
He also directs that the proceeds of the lands and personal property directed to be sold after the death of the widow, be divided between certain relatives; that should any „of these persons contest his will, such persons should forfeit their shares, which should then go to those of said relatives who should not contest the will; *197 and if all of said relatives should contest the will, then the entire fund bequeathed to them to be appropriated to the same uses and. purposes as the proceeds of the Spring Hill lands. In conclusion, the testator requests his executors to have all his negroes well attended to when sick, and to be in no manner maltreated.
After the decease of Samuel Winstead, his widow intermarried with Jeremiah Stephenson; and the original bill in this cause was filed by said Stephenson and wife, claiming, amongst other things, that they were entitled to the possession and control of the moneys deposited in bank, during the life of Mrs. Stephenson, and to retain all the interest and profits thereof.
To this bill and its amendments, the negroes, by next friend appointed by the Court, filed a cross bill, denying the claim of the complainants; asserting their own right to the fund and its increase; charging that the executors had been guilty of various breaches of trust in regard to the fund, and praying for an account against them; for a construction of the will, and for other and general relief.
This Court, upon the former appeal, in 1859, decided that the negroes, at the decease of Mrs. Stephenson, would be entitled to the benefit of the funds deposited in bank by the executors, and to all the profits that the executors might have made upon or out of the trust fund; and directed that the cause be remanded and remain in court till the death of Mrs. Stephenson, for the making of such orders as might be necessary, from time to time, for its protection.
The cause being remanded to the Chancery Court, no *198 account was taken or final decree made, .until after tbe death of Mrs. Stephenson, which occurred in 1862. A supplemental bill was then filed by the nest friend, on behalf of the negroes, stating the death of Mrs. Stephenson, and making her administrator a party defendant, stating that the negroes were now free, but in an unprotected condition, and without means of support, except the fund bequeathed for their benefit; and that it would be for their interest to be placed in the hands and under the control of some suitable person, until they could be sent to Liberia.
On the 9th of April, 1862, the Court, upon this supplemental bill and the answer of the executors thereto, appointed John H. Miller a receiver to take charge of the negroes, and to hire out those capable of labor.
On the same day, the next friend of the negroes and the solicitor of the executors, presented to the Court a written stipulation for the settlement of the litigation between the negroes and the executors, and a decree was entered in accordance with the said agreement; the decree reciting that it appeared to the Court that the adjustment was reasonable and just to all parties, and especially to the negroes. By this settlement and decree the executors were charged with a balance of cash in their hands, belonging to the fund of the negroes, (after crediting them with the sum of $8,498.98, for payment of debts, expenses of administration and compensation to the executors,) of $27,177.44. They are charged with the sum of $6,645.29, as interest on this balance while in their hands, and are credited with the further' sum of $4,823.33, for moneys advanced' and for- services not *199 theretofore allowed; and it was decreed that they pay to the solicitors for the negroes, out of the fund, a fee of $750, and that they pay the balance in their hands into the bank, subject to the orders of the Court; and that on so doing, they be discharged as executors.
This decree is brought by the negroes to this Court by writ of error, and the question is made, to what extent can this Court afford relief in favor of persons under disability against a decree which is made by the consent of the next friend of the incompetent party.
It is the duty of the Court of Chancery to protect the interests of parties under disability, and to supervise and control the action of next friends and guardians ad litem; and it will not suffer any agreement or consent of these representatives to prejudice the rights of the wards of the Court. Where such parties are concerned, the Court will not generally make a decree by consent without a reference to ascertain whether it will be for their benefit. A decree thus made, is not, for that reason, void, and if found to be beneficial to the incompetent party, will not be reversed, merely because made without a reference: 1 Dan. Ch. Pr., 3d Am. Ed., 73, 153, 165.
But this Court will look narrowly into such decrees, and if they are found to be prejudicial to the .interests of the parties represented by a next friend or guardian ad litem, it will reverse or modify them, and will make such decrees in the case as are necessary to the .protection of such parties.
The next friend of the negroes, by the agreement in this cause, waived all' claim against the executors for the profits of speculations which it was charged in the cross *200 bill they had made with the trust fund, and consented to a decree against them for a limited amount of in terest upon the funds in their hands. The making of such speculations with the fund is positively denied in the answer of the executors; and as it appears that the Court, as well as the next friend, who seems to have been in good faith endeavoring to protect the negroes, was satisfied that the agreement was beneficial to the negroes, and that nothing 'further could be realized by pursuing a litigation as to that matter, we will not, in the absence of anything to show that such profits or speculations had been made by the executors, disturb the decree in that respect.
Other questions in the case, depend upon the construction to be given to certain clauses in the will of Samuel Winstead.
By the first clause of the will, the burial expenses and debts of the testator were directed to be paid as soon as possible, but no fund was expressly indicated for these purposes.
By the second clause, there was appropriated to the widow during her life, to dispose of as she might need for the use of 'the family, all the property of the testator, including any money on hand, excepting the lands directed to be sold for the benefit of the negroes, and excepting, also, as directed in the codicil, the money and debts due the testator.
It appears from the pleadings in the case, that a portion of the testator’s estate consisted of money deposited by him in the Plánter’s Bank. These deposits, though in a certain sense moneys “due” the testator, must be considered *201 as more appropriately designated in this will by the term “money on hand/’ and would, therefore, go, in the first instance, to the widow under the general 'bequest to her for life, for the use of the family: See 1 Roper on Leg., 282-3; Redfield on Wills, ch. 13, sec. 48, pp. 431, 438, 441; 2 Williams on Ex’rs, 1070-2. The context may, in various cases, indicate a construction more or less extended to be given to the expression “ money on hand,” but the testator, in the present instance, must have employed it as including the balance at his bankers.
The fund set apart for the benefit of the negroes consisted of the proceeds of the lands directed to be sold for that purpose, and the debts collected; and if the money deposited in the bank by the testator was not used in the payment of debts and expenses, or disposed of by the widow during her life, as permitted in the second clause of the will, any portion of it which remained at her death, would also go into the fund of the negroes, under the designation of “any remaining money of my estate that is not otherwise disposed of.” ,
In the decree of the Chancellor the executors are credited with debts paid and expenses of administration, to the amount of more than thirteen thousand dollars; and it would seem that a large, portion of this amount must have been paid from the fond belonging to the ne-groes. It is necessary, therefore, to inquire upon what funds of the estate these expenditures are properly chargeable.
The testator directed his debts and burial expenses to be paid as soon as possible, and evidently supposed that his estate would possess a fond immediately available for *202 that purpose. In the total absence of directions in the will, • the compensation of the executors and other expenses of administration, would be chargeable upon the same funds as debts and funeral expenses; and that would be upon, general and residuary legacies in the first instance, in exoneration of specific or demonstrative legacies.
The bequest to the negroes of the proceeds of the lands and of debts due the testator, was not chargeable in the first instance, with' the payment of debts or expenses. Neither were these chargeable in the first instance, upon the homestead, the turnpike stock, the furniture? and the rents and profits of the land and negroes — these being specifically devised and bequeathed to the widow by the fourth clause of the will — nor upon the four tracts of land directed by the fifth clause to be sold after the death of the widow for the benefit of the nephews and neices of the' testator.
But the disposition which is made by the second clause of all the testator’s property, except that set apart for the negroes, is general and residuary in its character;, and whatever property of the testator was disposed of by this clause, and not specifically given in the subsequent clauses, constituted the proper fund for the payment of debts, expenses of administration, and general legacies. This included the money actually in the testator’s hands at his decease, and that then on deposit for him in the Planters’ Bank; and may have included other property belonging to the testator, though there is nothing in this record to show that he had- any property except that expressly mentioned in the will.
The duty of the executors was to pay the debts and *203 expenses of administration, out of the money on hand and on deposit at the testator’s death,. and out of the proceeds of any other property not specifically disposed of, if such there was; and they had no right to pay these debts and expenses out of the fund belonging to the negroes, unless the fund first liable- proved insufficient; and they had no right to pay the legacy of one thousand dollars to the widow out of this trust fund, in any case. This legacy was a general one, and payable out of the same fund which was chargeable with debts and expenses. If this proved insufficient, the fund belonging to the negroes could not be liable to pay it, or to contribute towards it. It does not appear from this record from what source this legacy was paid.
If the executors have wrongfully made payments out of this trust fund, they are personally responsible for such misappropriation; and the negroes are also entitled to have the trust fund reimbursed to the extent of such wrongful appropriation, out of the property primarily liable, if it or its proceeds still exists.
If the property primarily liable was insufficient for the payment of the debts and expenses, and these have been paid out of the trust fund, then this fund is entitled to contribution from the other legatees and devi-sees in proportion to their respective interests.
It is alleged on the part of the executors, that they made a settlement with the County Clerk, in 1858; but the evidence of this settlement is not in this record, and we cannot see that it was made upon notice, or that it is conclusive upon any one.
*204 The Chancellor decreed credits to the executors to the amount of $13,322.31, in gross, for debts paid, and for their own compensation; but it does not appear what portion of these credits was for debts, and what for compensation; and we therefore make no decree here as to the amount of either; and these items must be settled hereafter.
We are satisfied, from a review of the record, that tbe decree of the Court below' did operate improperly, to charge a considerable proportion of the debts of the estate and expenses of administration, upon the trust fund; and that the decree, though by consent, was improvident in that respect, and should be set aside. But we affirm the decree so far as it charges the executors with interest upon the fund, and affirms the compromise made by the next friend with the executors, as to the alleged speculations of the executors with the fund, and the making of profits for themselves out of it, and out of purchases of the trust property. The decree as to the interest charged against the executors, was clearly justified by the admissions in the answer.
The cause must be remanded to the Chancery Court where the proper accounts can be taken. So far as relief may be sought against the executors of Samuel Winstead and against the estate of Mrs. Stephenson, the proper representatives are already before the Court. And. for the mere purpose of securing payment to the negroes of the fund to which they are entitled and now in court or in the hands of the executors, no further parties are necessary. But if it is sought to recover *205 contribution directly from other legatees, such legatees must be parties.
As to tbe compensation of $750.00 decreed to the solicitor and next friend of the negroes by this decree, this was a matter peculiarly proper for the consideration and discretion of the Chancellor. It was settled by a reference to the Clerk and Master, and we are not disposed to disturb the decree in that respect.
We cannot, upon this record, decide as to the effect of the payment by the executors of the bills of the Bank of Tennessee. This payment was made upon and in pursuance of the final decree, and the Chancery Court has made no decision or decree as to its effect as a satisfaction which we can revise. Neither can we now decide as to the propriety of the several decrees in regard to the compensation of the receiver and the last order awarding additional compensation to the solicitors. After the final decree between the negroes and the executors the cause was kept in court merely for the purpose of protecting the negroes by the intervention of a receiver. But his accounts have not been settled, and no final decree has been made as to his compensation.
In the anomalous, half emancipated condition in which, by our law, these negroes were left at the decease of Mrs. Stephenson, and in the turmoil of the late war, the appointment of a receiver was probably necessary for their protection, and was justifiable under the laws then in force. The receiver is entitled to reasonable compensation, which must be fixed and allowed out of the earnings of the negroes.
*206 By section 2704, of the Code, the money arising from the hire of slaves liberated under the same will, and hired out by order of the Court, is a joint fund for the benefit of all who claim freedom under the same will. It is doubtful if this section applies to any case, except that specified in the next preceding section, where it is necessary to raise a fund for the purpose of defraying the expense of transportation to Africa.
This was a regulation of the slave Code in pursuance of the policy of the State, but did not confer a vested right to these earnings upon those whose labor did not contribute thereto. And when the laws and policy of the State were changed, the equitable right of those whose labor produced this fund, became superior to any claim on the part of the others. The proceeds of the hire must be given to those who earned it.
The intention of the testator evidently was, that the fund should be divided per capita among those who should eventually become entitled to the benefit of it. The time fixed for the division was upon their arrival in Liberia; and their individual rights in the fund could not be fixed or ascertained till they should arrive there, when it would belong to those who should arrive there as a class. Up to the period of the abolition of slavery in this State, on the 22nd of February, 1865, the individual rights of the negroes to the fund were undetermined. But on that day, by the change in the letter and policy of our laws, they became entitled to receive and enjoy the fund provided for them without the necessity of going to Liberia to receive it. And at that time the right of each individual then in esse to his or *207 her share of the fund, became perfect. The fund must be divided upon that basis, and the representatives of such as have died since that time, will take the shares of their respective decedents.
In April, 1866, a petition was presented on behalf of the heirs and next of kin of Samuel Winstead, charging that the negroes had elected to remain in this country instead of going to Liberia to receive their legacy; and that by this election, they had forfeited their right to the legacy, which thereupon lapsed, and that the petitioners became entitled thereto; and praying that it be decreed to them. The Court refused to allow the petition to be filed in the cause. And upon this decree the peti-. tioners brought a writ of error.
There was no error in this order of the Court. The petition contained no equity, and showed upon its face that the petitioners had no claim to the relief sought.
The case of Banks vs. Banks, 2 Cold, 546, is conclusive of this question as an authority, and is sound in principle.
By the law of this State, as it existed at the time when the original will now before us was executed, manumitted slaves could not be allowed to remain in this State, except by express permission of the County Court, granted upon petition, and upon giving bond or recognizance in the penalty of five hundred dollars, with two or more good sureties, conditioned that such negro should keep the peace and not become chargeable to the county —such bond to be given for each child as well as for adults, to be renewed every three years, and not to au *208 thorize such negro to reside in any county except that in which the bond was given; and if such privilege of residence was revoked by the County Court, or discontinued; such negro was required to leave the State within twenty days, and on failure to do so, was liable to indictment and punishment for the first offense, by fine of not less than ten nor more than fifty dollars, and imprisonment for not less than one nor more than two years; and for the second offense by imprisonment for four years: Act of 1831, chap. 102; Act of 1842, chap. 191. By provisions subsequently enacted, manumitted slaves were absolutely prohibited from remaining, in the State upon any terms.
As was said in the opinion of this Court on the former hearing of this cause, (3 Head., 731,) ^the predominant idea and purpose in the mind of the testator was, the emancipation of his slaves after they had served his •wife during her life.” He guards this purpose with most earnest solicitude, as a principal purpose of his will; and in the codicil, evidently considering the impossibility that his slaves should ever enjoy freedom in this State, he revokes the permission given in the original will to remain here and receive a portion of the fund, and requires all to go to Liberia; and at the same time, holds a scourge over his relatives, who might be under temptation to attempt to defeat his benevolent purpose.
These limitations were wise when the will was executed, in view of the primary object of the testator. But when slavery was abolished, and the whole tenor and policy of the law in regard to emancipated slaves was changed, and under the laws and Constitution of *209 this State and of the - United States, all men were invested with equal rights as to residence and property, the reason of these limitations wholly failed. There was no longer any reason why the negroes should go to Liberia to receive the benefit of the testator’s bounty. If the negroes and the fund were sent to Liberia, and the fund there distributed to them, they would have a perfect right to return to this country in the same vessel which took them out, bringing the money with them.
The Court will not go through with the merely useless formality of sending this fund in charge of a special messenger, to Africa, and sending the legatees there to receive it, at the expenditure of the major part of the fund, while the legatees and the fund are both- in the presence of the Court. It cannot be presumed that the testator intended the enactment of such a farcical proceeding.
Even if it were held that it was necessary that the negroes should go to Africa to receive this fund, the filing of a bill insisting upon their right to receive it here, would not amount to a forfeiture or a renunciation of the legacy, of which the next of kin could take advantage. If such forfeiture or renunciation should" occur, those next entitled may present their claim to the fund; but until that time, they have no title to interfere for the purpose of insisting upon the performance of conditions in which they have no interest
By the terms of the will, the remainder of the fund, after payment of the expenses of transportation, was to he divided among the negroes. If any unexpected circumstance should lessen the anticipated expense, of if *210 some society or individual should assume the entire es-pense, the fund thereby sayed would be for the benefit of the beneficiaries, and not for that of the nest of kin. Unexpected circumstances have rendered any expenditure for transportation unnecessary; but it does not concern the next of kin whether it be necessary to expend much, little, or nothing, for that purpose.
The decree of the Chancellor upon the above-mentioned petition, is affirmed. ,